May it please the court, I'm Robert Jobe, and I'm appearing today on behalf of the petitioner Mohinder Singh. I'd like to jump right in to the transcript, if I can, page 156 of the transcript. Because in this case, the immigration judge repeatedly admonished the petitioner that he needed to be what she called responsive, and she told him, for example, on page 156 of the transcript or of the record, if you're not responsive, it will be an indication of you reciting a memorized story rather than being honest and upfront about what's asked of you. She repeated that same admonition twice during the course of the hearing. She found him to be unresponsive in four separate instances. For example, here on page 156, when Mr. Singh was recounting the circumstances of his release following his 1996 arrest, he was asked, the question was, now, why were you released? This is on page 156. And he goes on to say, I was released because they didn't give me any treatment there, there was no medicines, my arms swollen, my leg was swollen, basically saying they needed me, they released me so I could get medical treatment. She says to the judge, you're not responsive, sir. The question to you was, when were you released? Why are you going into a question in areas that we're not asking? He wasn't asked, when were you released? He was asked, why were you released? And then she goes on to admonish him, you need to be responsive, sir. If you're not, it will be an indication that you are reciting a memorized story. That phrase or area you just recited, isn't that sort of one of the problematic issues here? Because maybe she said when and where, and there seems to be translation difficulties where people are talking past each other in this record. Right. That's exactly right. But here is a clear example where she's saying he's not responsive. When he was responsive, she misunderstood the question. Another example of this, Your Honor, is on page 177 of the transcript. And this begins on line 11, where he was being questioned about his first arrest. And he answers the question about the first arrest, and then on line 18, the question begins, and then the second arrest, and the questioner says, I mean, excuse me. And then Mr. Singh interjects, the second question mark, asking which arrest are you talking about? And he goes on to say, which one are you asking me about? Because he's trying to clarify. Two sentences earlier, he was being asked about the first arrest, now she's asking about the second. He's just trying to clarify. The judge jumps in, how many second arrests do you have, sir? And then she goes on on the following page, and again on page 178, she says, the government was asking you an English question, and you proceeded to respond and talk about your second arrest, and then you said which one. Let me remind you to be responsive and provide answer to the question that is asked, rather than just reciting something that you might have memorized or you think you need to talk about. The guy was just asking, which arrest are you talking about? You know? Even the question, the question said, and then the second arrest, and the questioner said, I mean, excuse me, the questioner wasn't even sure which arrest she was talking about. The third example of this alleged nonresponsiveness relates to the November 1995 arrest. This is on page 146. And the question to Mr. Singh is, and why did they come to your house? She's talking about the police. Now, the answer to that question, Mr. Singh was never allowed to answer it at the hearing, but the answer to that question is set forth in two different places here. If you look at his declaration, he says that his 1995 arrest came in the aftermath of the killing of Beyonce Singh, and he says in response to that killing, the police arrested thousands of Sikhs. They targeted Sikhs who had been arrested before or who had been politically active against the government in the past. And at the asylum office, he said the same thing. He said that you, according to the asylum office, you stated that the police in Punjab were arresting members of Akali Dal after the assassination of Beyonce Singh. So when he's asked that question in court, he begins to talk about his political activities. He starts talking about, I was a member of Akali Dal, and I was involved in these various elections, and she cuts him off. She doesn't want to hear that answer, and she says, you're not being responsive, sir. You're talking about, we're talking about 1995, and you're going back to 1985. But that's how he needed to answer the question, because the answer to the question is they were targeting people that were politically active. He's attempting to explain his political activities and draw the connection, and she cut him off. He was being entirely responsive. She just didn't want to hear his answer. The final example of this is this incident about the, his testimony about his knee. And this begins really, it begins in the transcript on page 190, but this begins really with the letter from the doctor, because the doctor who treated him following the 1995 arrest submitted a statement that he was having bruising injuries and swelling over his face and limbs. So then they ask him about this, and the question begins on page 190, where the questioner misreads the letter and says, the letter says you had swelling over your face and lips, and that's what you were treated for the first time. How did she read it? Lips rather than limbs. And he says in response, no, I had swelling, yes, I had swelling all over my body was his answer. And then the questioner says, well, it doesn't mention your knees. It doesn't specifically mention your knees in these letters. And this is on 191 and 192. Again, here on 192, it says, do you know why in the letter your doctor didn't mention that during 1995 your knee was a problem? The letter had said his limbs were swollen. And he said at that time my entire body was swollen. He's perfectly consistent with the letter. The letter said his limbs were swollen. He says my entire body was swollen, including my knees. But the judge chastises him because he refuses to characterize that swelling as an injury. But that, as you look at it, it's clear that what he means there, and he says it over and over again, that my knees were swollen, but there was no exterior wound. And this is on 193. He says there was no wound on the knee, but the knee was swollen. That's 193 lines 3 and 4. Again, they kept hitting me, but there was no injury to the knee. But he goes on to explain, there was no injury like there was no blood injury. And then the judge says, I'm not talking about wounds. You're being very evasive at this point. He's not being evasive. He's telling her, my knees were swollen, but there wasn't a blood injury. There wasn't any wound as such. And he goes on and he repeats that over and over again. And at the end of this discussion, where he's perfectly consistent saying, my knees were swollen, but there wasn't a real wound as such, she says, I'd like the record to reflect that this respondent is being unresponsive. He wasn't. He was perfectly consistent and he was responsive. I think I'll reserve the balance of my time to see what the government has to say. All right. Good morning, Your Honors, and may it please the Court. My name is Jonathan Robbins. I'm here on behalf of Eric Holder, the Respondent. I think you would do better if you could speak a little louder. Certainly, Your Honor. I guess I wasn't speaking into the microphone there. Sorry. As you know, the ---- Why don't we wait just a moment, because the clerk needs to give you your 10 minutes. Okay. Thank you. Okay. Start all over. We've got the Eric Holder part, so go ahead. Okay. As you know, the asylum withholding of removal and cap protections claims are based on his political activity or his claimed political activity as a member, as a Sikh in the Punjab district of India. Now, my opposing counsel here, my colleague, has pointed to specific instances in the transcript and sort of, you know, filled in some of the gaps to make them appear responsive when they may not always be responsive. But the fact is that the inconsistencies upon which the immigration judge based the adverse credibility finding in this case are pretty sound. Specifically, let's talk about the knee injury. When the Petitioner submitted a document from a doctor who evaluated him, dated in 2003, where this document basically talks about how they're treating him for this knee injury that's so bad that it's been lingering for nearly a decade now. They're giving him different medication because of this lingering. And now this injury purportedly happened back in 1995 and 1996 during the third and fourth arrests. And the Petitioner claimed that his knee was dislocated. Now, bear in mind that a lot of these Sikh cases are fraudulent. That's in the record under the profile in these Indian Sikh claims. And where these cases fall apart is where the documentation doesn't match up with their testimony. He's claiming that, you know, he suffered this dislocated knee, and when he was asked about this knee injury, the part of the transcript which he just read, his first response was to say, well, my knee had already recovered by the time these Indian physicians had treated my wounds. That's why it's not in these documents that were submitted by the Indian physicians that were dated far before this 2003 document. So, you know, his first response was to say my knee had already recovered. Then he changed his response and said that, oh, well, you know, it had been dislocated. Nowhere in any of the documentation prior to this 2003 document is there any indication that his knee had been dislocated. And this is the injury, according to his story, which has been the most lingering injury that he has. So that's a pretty sound basis for an adverse credibility finding. I mean, that's where these claims fall apart is where the documentation doesn't match up. That's where you find the holes in these stories. As far as the responsiveness, I mean, opposing counsel has definitely offered plausible explanations for why these instances might be deemed responsive rather than nonresponsive. Although I have to say, reading this, I felt like I was in a Laurel and Hardy routine, to be honest, reading this transcript. It was like no one was making any sense. I mean, they're like, I'm talking about this, no, I'm talking about that. And it's almost, and it may be a translation problem. That's what I don't know. But reading it, it's pretty hard to discern how you could make any credibility finding from it. At least I'm looking now at the knee one, because there seems to be a collision here between a wound, what somebody might think of as a wound where there's bleeding, or some kind of injury. And it literally makes no sense. And I recognize you weren't there to crack the record, but this is the one we've been dealt. So, like, just take the knee, for example. I really have trouble understanding the transcript. With respect to the wound and the external injury, I mean, I read the transcript, and my personal reading of it is it does look like there's a problem, like they're confusing the word, the term wound with injury, and that he is saying that there was no external bleeding and that his leg was swollen. But the problem here is that he claimed his leg was dislocated. And in the documents that were submitted by the Indian physicians, this is documentation, not testimony now. In the documents that they submitted, there's no mention of any dislocation of a knee. There's no mention of a knee, period. And then he submits this document in 2003 that says, oh, he's got this lingering injury. There's a huge problem with his knee. And when he was confronted with that, his first response, his first response, and there's no confusion in the translation here, is that why isn't this in the documentation from these Indian physicians that treated you when you first had this wound? And he said, my knee had already recovered by then. That was his first initial response. And that's, you know, that's what happens when somebody gets caught with a hole in their story. First there's a denial. Then all of a sudden there's this, you know, back Laurel and Hardy routine. I don't know whether or not it's a translation error or not, but I do know that they didn't choose to address this on redirect examination. They just let it lie. And so the immigration judge is left with this inconsistent documentation, physician reports, handwritten physician reports, which don't mention anything about what's supposedly the most significant injury that he sustained. So, I mean, is that a basis for an adverse credibility finding? I think you could go either way, to be frank. I mean, maybe he is, maybe he isn't. But the question isn't whether or not they've offered a plausible explanation for this. The question is whether or not the record compels that explanation. Well, I think, as you agree, the immigration judge really didn't get it when he was trying to explain it. He explains very patiently what he means. And she somehow brushes all that aside. She's too impatient. Well, I think that has to do in part with the demeanor finding that the immigration judge made. Because what the immigration judge stated was that it appeared as though the petitioner was simply reciting his crafted story, rather than responding the way a credible witness would respond. Well, it's still, even if you, as a judge, have doubts about a person, you've got to give them a chance and understand what they're saying. Well, she doesn't get it. It's pretty plain. I think you see that as well as I do. I don't think that the immigration judge didn't get it. I mean, yes, did she specifically warn him numerous times to be responsive to the question. Oh, but she said, you're evasive. And he's telling her, he's saying, I don't mean any bleeding. And she, oh, you're evasive. No. Well, I agree with you. He was the patient one. She was the obtuse one. Well, I agree that it does appear as though there was a confusion over what he was saying was an injury. Because remember, he had just answered the question. They asked him, did you sustain injury to your knee? And he said, no, two times. So the immigration judge was saying, what's going on here? But they ended up sorting it out and saying, and, you know, maybe that was, you know, is it a plausible explanation that he had offered? But, again, the problem was his initial response to the knee injury, saying that it had recovered in 1995 and 1996 prior to when the Indian physicians had treated that wound. And, again, is their explanation for this inconsistency plausible? Yes, it's plausible. But is it also plausible that this was being a hole in his story that he was caught in and that his initial response was not credible? That's also possible. I think when you combine that with the fact that the immigration judge specifically said that he was just simply reciting a story rather than giving testimony that's consisted with a credible applicant. And also there's the instance where in his letter to the ---- Could I just ask you to go back on the knee not being injured? Yes. Just tell me the transcript reference so I could go back on that again. Certainly. Thank you. This is ---- Here we go. I think it's page 192 of the administrative record. All right. Let's see. Do you know that your doctor's letter made no mention of the problem associated with your knee, that they had recovered by that time? That was his initial response to the knee injury, is saying that his knee had recovered. And yet here we have in the documentation a 2003 letter from years later saying that this injury was so severe that it's still being treated to that very day. That was the initial response that he made. And then you have this sort of what you call the Laurel and Hardy ---- Just going on ahead. I mean, again, it may be a sufficient basis for credibility. But after he says, well, because they'd recovered, he says, well, do you know why the letter didn't mention that your knee was a problem? And then he says 1996. He said, well, at that time the entire body was swollen. But, again, this isn't just a swollen knee. He claims that his knee was dislocated. There's no mention of any dislocation. That's not the same thing as swelling. Who fixed the dislocated knee? I mean, that's nowhere in the documentation with the Indian physicians. And you'd think that if this injury was so severe that it's still affecting him in 2003, that there would be some sort of mention of that. And, again, there's another inconsistency with respect to the ---- that the immigration judge based the adverse credibility finding on with his response to the asylum officer's notice of intent to deny, where he just makes a blanket statement, I was arrested three times. That would seem to be in direct contradiction to his testimony in his asylum application in which he says that he was arrested five or six times. I think it's five times and one escape or something along those lines. But, again, now is it plausible that he was just responding with only three arrests in his letter? It's plausible. But is it also plausible that this is an inconsistency? Yes. And, again, the standard of review is does the record compel a finding that this is ---- the only way the immigration judge could have come out is to say that he was credible in light of this inconsistency. I mean, this is how claims ---- this is ---- I mean, when somebody ---- you'll look in the record and in the profile dealing with these Indian claims from ---- with Sikhs who claim persecution in the Punjab district, there's an extremely high level of fraudulent claims here. That's outside of this particular ---- Correct. The specifics of this particular claim. And this is how you establish credibility, whether or not the documentation is consistent with the testimony, whether or not, you know, the injuries that they claim match up with physicians' reports. When there are holes in that, an immigration judge is entitled to look at this, particularly where there's a demeanor problem in the way that it appears that they're reciting a story, to say, you have incredibly established your claim. You know, if you're going to go by generalizations, I've been on this Court long enough. Certainly, Your Honor. To see lots of examples of brutality by the Indian police putting down the Sikhs over the Punjab. There certainly are, Your Honor. But there are also a high number of fraudulent applications. And how you determine whether or not they're fraudulent or not is whether or not they're the evidence that they submit is consistent. We can't go by the generalizations. We have to take them. Certainly not. But it's part of the record here, the specific profile. I'm not bringing in something outside. I mean, it's in the record here. Thank you.  Thank you very much for your time, Your Honors. Would you address yourself to this inconsistency that the government points to, which is that his knee was dislocated? No, it actually didn't. It got fixed by the time he got there. Yeah. No, I had a wound. I think he's misreading the record, because he's suggesting that Mr. Singh had said that his knee had recovered by the time he was treated in 1995. That's not true. I mean, the doctor said his body was swollen. This passage that he's citing here on page 192, at the time my knees had recovered, it begins on page 191. And the judge is asking not about the 1995 letter. She's asking about the 1996 letter. This begins 191 lines 3 and 4. She's asking, in June of 1996, it says you were treated for a dislocated elbow. And that continues about the 1996 letter. And so then when she gets to this point and she says, do you know what your doctor's letter makes no mention of the problem associated with the knee? Well, they had recovered by that time. He's talking about the 1996 letter. Which was the elbow letter? Yeah. At that time, there was an elbow. It's important to recognize, in 1995, he had this situation where they put the rod behind his knees and pulled his legs back over. 1995. That didn't happen in 1996. His knees weren't particularly bothering him in 1996. It happened again in 1997. So it's hardly surprising that it's not mentioned in the 1996 letter in counsel's suggestion to the contrary. It's just wrong. I do want to just comment real briefly on the demeanor finding, because it's aggravating to me that Judge Yam threw this in. But it seems to me what's important about the demeanor finding is it's not very well explained. But she says the demeanor of the respondent is not credible. And then she says, for example, suggesting that there's several things she's relying on, but she's going to describe one. As he was describing the alleged beating, and then she goes on and says her favorite line, he was talking as though he was reciting a story and there was no real emotion that the court can see. And it's that reciting a story thing that bothers me, because that's what she was saying throughout the hearing. Every time she thought he was being evasive and every time she was being unresponsive, he was being unresponsive. And it seems to me that the demeanor finding is infected by her belief that he was either evasive or unresponsive. And those findings just aren't supported by the record. Thank you. I thank both counsel for your argument this morning. The case just argued Sing v. Holder is submitted.
judges: Noonan, McKeown, Archer